

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON, II (247952)
PAULA R. BROWN (254142)
701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

[Additional Counsel Appear on Signature Page]

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SILVIA FRANCO, individually and on behalf of all others similarly situated, | Case No. **'17CV161  GPC MDD** |
| | **CLASS ACTION** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| FORD MOTOR COMPANY, | |
| Defendant. | JURY TRIAL DEMANDED |

Case No.

CLASS ACTION COMPLAINT

00111257

Plaintiff Silvia Franco ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to herself and on information and belief as to all other matters, by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant Ford Motor Company ("Ford" or "Defendant"), and alleges as follows:

## NATURE OF THE CASE

1.     The Ford, Lincoln and Mercury automobiles at issue are prone to rapid unintended deceleration, which poses a serious safety risk to the vehicle's occupants and other motorists.

2.     Since the release of certain of its 2009 model year vehicles, Ford has marketed, sold and equipped Ford, Lincoln, and Mercury vehicles with defective electronic throttle body control systems ("ETB"). Ford has also failed to install appropriate features to mitigate the risk of sudden unintended deceleration ("SUD"). Ford has not fixed the SUD problem, adequately warned purchasers of the SUD hazard, nor adequately instructed drivers about how to handle SUD. Rather, it has downplayed and covered up the problem, has not repaired the Defective Vehicles, and has not offered to reimburse the Defective Vehicle owners for costs they incurred to identify and repair the defect.

3.     Ford has long known of the SUD defect, yet has failed to disclose the existence of this defect to Plaintiff, other Class members, or the public. Instead, Ford has engaged in a secret recall, euphemistically called a "customer satisfaction program." The program, which covered only some of the affected models, provided inadequate relief. The customer satisfaction program also continued to mislead Defective Vehicle owners because owners whose vehicles were not included in the program were lead to believe their vehicles were not affected, when they were. Not only that, Ford continues to equip the subject vehicles with the defective and dangerous ETBs. As a result, Ford continues to leave millions of drivers at a heightened risk of an SUD event. Even with its

BLOOD HURST & O'REARDON, LLP

00111257

BLOOD HURST & O'REARDON, LLP

extended warranty program for some vehicles, Ford downplays its significance. Rather than admitting its vehicles are actually dangerous and defective or announcing a recall for all Defective Vehicles, Ford deemed the warranty program a "customer satisfaction program" resulting from electrical contamination that did not present an "unreasonable risk to motor vehicle safety." Ford does this because if it were to admit the problem, it would have to fix far more vehicles at considerable cost and further negative publicity.

4.      Ford's conduct has had the effect of denying those who own or lease Ford and Lincoln vehicles their full rights under the law. These rights include consumers' pre-purchase or lease rights to fair and reasonable information as well as post-purchase or lease rights, including rights under the Song-Beverly Consumer Warranty Act, commonly known as California's lemon law. Ford also has failed to fully, adequately, and effectively tell consumers what they must do if the vehicles they are driving unintentionally and suddenly decelerate. To do so, and to do so effectively, would protect lives, but would also constitute an admission of a problem, so Ford refuses to act responsibly and morally, choosing profit instead. Ford has chosen to deceive its customers rather than educate them with life-saving information about its vehicles.

5.      This is a class action brought on behalf of all consumers who purchased or leased a Ford, Lincoln, or Mercury vehicle equipped with the defective electronic throttle body system at issue (the "Defective Vehicles"). Upon information and belief, the Defective Vehicles include:

- 2011-2014 Lincoln Mark LT with 3.5L and 3.7L engines;
- 2011-2016 Lincoln MKX with 3.7L engine;
- 2013-2016 Lincoln MKZ with 3.7L engine (base and Black label models);
- 2013-2016 Lincoln MKT with 3.7L engine (base model);
- 2013-2015 Lincoln MKS with 3.7L engine (base model);

- 2011-2016 Ford Edge with 3.5L engine;
- 2011-2014 Ford Edge with 3.7L engine;
- 2015-2016 Ford Mustang with 3.7L engine;
- 2011-2014 Ford Mustang (base, GT and Shelby models);
- 2013-2015 Ford Taurus with 3.5L engine;
- 2011-2014 Ford F-150 with 3.7L engine;
- 2015-2016 Ford F-150 with 3.5L Duratec V6 engine; and
- 2011-2016 Ford Explorer with 3.5L Duratec V6 engine.

Excluded from the proposed Class are those who have claims for personal injury or wrongful death as a result of the SUD of their Defective Vehicle.

6.     Plaintiff, on behalf of herself, all others similarly situated, and the general public, seeks damages and equitable relief, including an injunction requiring Ford to fix all Defective Vehicles, replace the dangerous and defective ETB, educate consumers through a corrective advertising campaign about the true nature and dangers posed by SUD in the Defective Vehicles, educate consumers about what they should do in the event they experience an SUD event, and educate consumers about their pre-purchase (or lease) legal rights and their post-purchase (or lease) legal rights once the true facts are known to them so that Class members can take advantage of those rights.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1332(d), because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100 members; (c) many of the proposed Class members are citizens of states that are diverse from Ford's citizenship; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

BLOOD HURST & O'REARDON, LLP

3

Case No.

CLASS ACTION COMPLAINT

8.    Venue is proper in this judicial District under 28 U.S.C. §1391(a) because a substantial part of the challenged conduct or omissions giving rise to claims occurred and/or emanated from this District, and Ford has caused harm to Class members residing in this District.

**PARTIES**

9.    Plaintiff Silvia Franco is a resident of the County of San Diego, State of California. In 2014, Ms. Franco purchased a 2012 Ford Explorer with a 3.5L Duratec V6 engine from Perry Ford, located at 2050 National City Blvd., National City, CA 91950. In or around June 2016, Ms. Franco was driving her Ford Explorer South on Interstate 5 when the vehicle suddenly and without warning experienced an SUD event. Since that first time, Ms. Franco has experienced two other SUD events while driving her Ford Explorer. Ms. Franco purchased her vehicle believing it was safe. She lost money and property as a result of Ford's conduct. She would not have purchased her Ford Explorer if she knew it was unsafe and potentially deadly to her and others because it contains a defective ETB that leads to SUD without warning.

10.    Defendant Ford Motor Company ("Ford") is incorporated in the State of Delaware and is headquartered in Dearborn, Michigan. Ford sells, markets, distributes, and services the Defective Vehicles.

**FACTUAL BACKGROUND**

***Electronic Throttle Control Systems and Electronic Throttle Bodies***

11.    An electronic throttle control ("ETC") electronically connects the accelerator pedal to the throttle to control the airflow to the engine. A butterfly valve in the ETC opens and closes to increase or decrease the amount of air flowing into the engine.

12.    When working correctly, if the driver presses on the accelerator pedal, the throttle plate rotates within the throttle body, allowing more air into the engine. As the driver presses down on the gas pedal to accelerate, a sensor

BLOOD HURST & O'REARDON, LLP

Case No.

**CLASS ACTION COMPLAINT**

called a "throttle position" sensor receives a signal relative to where the pedal is, ranging from all the way up (zero acceleration), to all the way down (full acceleration). This sensor relays this pedal position information to the car's main computer, which is how the computer knows what to tell the fuel injection system in terms of how much more or less fuel to inject into the system.

13.    The ETC computer technology replaced safe and reliable cabling, which mechanically connected the accelerator pedal to the throttle valve.

14.    An ETC system has three components: (1) an accelerator pedal module; (2) the ETB throttle valve that can be opened and closed by an electric motor; and (3) an engine control module ("ECM").

15.    The ECM uses software to determine the required throttle opening position by calculating data measured by other sensors, including the accelerator pedal position sensor, engine speed sensor, vehicle speed sensor, and cruise control mechanism.

16.    The ETB has position sensors, which provide electronic signals to the ECM indicating the position of the vehicle's throttle. Accordingly, the ETB controls the position of the throttle valve, which in turn manages the amount of air entering the engine.

17.    If the ETC is not working properly, including as a result of problems with computer code or electrical connectivity, the signal misinterprets the vehicle's throttle position, which causes the vehicle to unintentionally decelerate.

18.    When a major system in the Defective Vehicles fails, the vehicle's onboard computer causes the vehicle to go into the Failure Mode Effects Management ("FMEM") mode. The vehicle goes into the FNEM mode when electrical connectivity fails, the ETB becomes stuck, the Malfunction Indicator Lamp ("MIL") or Wrench light will illuminate, the vehicle may enter a "limp home" mode, and engine power and vehicle speed are reduced by the vehicle's

onboard computer, which is programmed to limit the engine's RPMs in the event of a failure. Ford's trade name for this feature is Failure Mode Effect Management ("FMEM") mode.

19.    Delphi is Ford's ETB supplier for the Defective Vehicles at issue.

20.    Beginning in 2009, Ford began using Delphi Gen 6 ETBs. The Defective Vehicles at issue all contain Delphi Gen 6 ETBs (parts numbers AT4Z-9E926-A and AT4Z-9E926-B), one of which is pictured below:



**Delphi Gen 6 Electronic Throttle Control Valve with Non-Contacting Throttle Position Sensor**

### *The Defective ETBs Render the Ford Vehicles Unsafe*

21.    Including because of investigations by the National Highway Traffic Safety Administration ("NHTSA"), the North Carolina Consumers Council ("NCCC"), thousands of online complaints, and tens of thousands of claims made by Defective Vehicle owners to Ford and its authorized dealers, Ford has known about the ETB defect and resulting SUD events for many years.

22.    Despite being on notice of the widespread problem and uniform defect, Ford has never issued a recall or told owners or lessees about the dangerous propensity of the Defective Vehicles to fail and experience harrowing SUD events. Instead, Ford has attempted to sweep this life-threatening issue

under the rug, and continues to manufacture cars with the defective ETBs.

23. In August 2012, the North Carolina Consumers Council officially petitioned NHTSA for a defect investigation into ETB failures in 2005-2012 Ford Escape vehicles. According to NCCC, it had received numerous complaints of repeated SUD incidents, which Ford dealers diagnosed as failed throttle bodies.[1] Ford dealers also attributed the defect to the same trouble codes – P2111 and P2112 – present in the onboard computer system. These trouble codes identified by Ford indicate the electronic throttle actuator control sticking open or closed.

24. In February 2013, NHTSA announced an investigation into 725,000 model year Ford Escape and Fusion, and Mercury Mariner and Milan vehicles over engine surging and stalling due to the defective ETBs. According to NHTSA, its Office of Defect Investigation identified 123 unique reports of reduced motive power or vehicle stall, with an increasing trend.[2]

25. On May 10, 2013, Ford responded to NHTSA by flatly rejecting any seriousness of sudden unintended deceleration: "Ford does not believe that a vehicle experiencing a throttle body issue that results in FMEM [failure mode effects management] mode presents an unreasonable risk to motor vehicle safety. Ford's electronic throttle control strategy allows the engine to operate and provides the driver with some amount of vehicle mobility to maneuver their vehicle to a safe location, even in the most severe FMEM mode."

26. Despite 12,000 complaints about SUD in Ford vehicles (over 10,000 of which Ford admitted previously possessing), including with Ford Escape and Ford Fusion vehicles, in February 2014, NHTSA announced it would not force Ford to issue a recall. Instead, it relied on Ford's assurances that a customer

---

[1]    http://www.prweb.com/releases/2012/9/prweb9923793.htm

[2]    http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM433980/INOA-PE13003-8737.PDF

7

Case No.

CLASS ACTION COMPLAINT

satisfaction program would fully address the danger and defect. Nevertheless, NHTSA made clear "the closing of this investigation does not constitute a finding that a safety-related defect does not exist."

27.    Through the issuance of two limited Customer Satisfaction Programs in 2014, Ford has admitted the ETB on certain of the Defective Vehicles leads to sudden unintended deceleration. However, Ford has failed to adequately inform consumers of the true nature of the defect, the number of vehicles and models actually affected, and continues to offer inadequate remedies.

28.    To appease NHTSA, in March 2014, Ford issued "Customer Satisfaction Program 13N03." The 13N03 program applied only to limited vehicles with the defective ETBs (2009-2013 model year Ford Escape, Ford Fusion, Mercury Mariner, and Mercury Milan vehicles), did not automatically reimburse owners for expenses relating to SUD events, did not notify all affected vehicle owners of the dangerous propensity of their vehicles to experience SUD, and was not a mandatory recall providing all vehicles with non-defective ETBs. The program merely extended warranty coverage of the ETB – forcing consumers to wait for their ETBs to break before the warranty coverage has any impact. That leaves drivers at risk of SUD. Ford never admitted its ETB was dangerous or defective. Instead, Ford blamed the issue on material buildup for ETB contacts that results in losing connectivity and engine power. In its letter to owners, Ford disguised what would happen when losing connectivity: "Your vehicle may develop contamination on the internal motor contacts of the Throttle Body, resulting in intermittent electrical connectivity." Ford's "fix" of providing a software update – and only then to complaining owners – did nothing to correct the root cause of the problem, the defective ETB.

29.    In or around May 2014, Ford announced a follow-up "customer satisfaction program" – 13B17. Ford's letter accompanying the 13B17 program

BLOOD HURST & O'REARDON, LLP

continued to downplay and disguise the seriousness of SUD and root cause of the ETB defect:

> In the interest of your satisfaction, Ford Motor Company has developed an updated powertrain calibration strategy that will allow more engine power based on driver input and vehicle performance. Ford is providing the updated calibration to you at no charge. This program is in addition to the CSB 13N03 announced earlier this year, which extends the warranty on the Throttle Body to a total of 10 years or 150,000 miles from the warranty start date, whichever occurs first.

The May 2014 program also did not include all vehicles with the defective ETBs. Furthermore, Ford continued to blame the defect and SUD on contamination resulting in intermittent connectivity, and it did not offer to address the root cause of the dangerous deceleration by replacing the defective ETBs.

30. Customer Satisfaction Programs 13N03 and 13B17 did not cover many of the Defective Vehicles (*e.g.*, Ford Explorer vehicles) even though they contain the materially identical and defective ETB.

31. The 2014 Customer Satisfaction Programs were not formal recalls and were not widely publicized. Rather, Ford's efforts to notify affected individuals of the 2014 programs consisted solely of sending letters to certain owners of certain affected Defective Vehicles based on address information obtained from a third party. Accordingly, by design, the 2014 programs did not reach numerous affected Class members. Additionally, the relief provided under the 2014 programs was inadequate and unnecessarily limited.

32. Contrary to Ford's statements to NHTSA and in its customer satisfaction letter, there are widespread complaints about unsafe SUD events with the Defective Vehicles:

- i have 2011 ford edge limited with 54k mileage. Im going through same situation right now. car starts to decelerate all of a sudden and it comes with message all wheel drive off and a ranch sign. first time i had this issue was on 2/20/16 when i

BLOOD HURST & O'REARDON, LLP

00111257

was 7 month pregnant and on my way to my baby shower. i called my dealer ad they said they can check the car but unless they can replicate the issue they might not be able to help at all. my husband started driving the car and it seemed problem just went away. well we were wrong because the problem came back again from last week and this time we were in highway and we had our 12 weeks old son in the car. the car is at the dealer currently and apparently they think the issue is related to throttle body and its going to cost me at least $700.00 and not covered by any types of warranty. I'm surprise ford hasn't been sued multiple times already since its a known issue and lots of ford owner been affected by it. the service and customer satisfaction department are not willing to help or acknowledge that its a safety issue. i think they are waiting for something really bad to happen to their client before they are willing to fix it.[3]

- While riding on highway 441 in Mcintyre, GA on my way back from a funeral, all of a sudden my car stops accelerating and low engine oil pressure message displays. Cars and big 18 wheelers are zooming by, however I was able to coast to the side of the road where the car shut off. I tried starting the car back up several times and it would just shut back off. The police officer that stopped to assist checked the oil and confirm I had plenty of oil as I'd just had an oil change the day before. The car had to be towed to a nearby shop where it remains. I had to pay for a rental, now going on a week. I contacted Ford and described the problem. The representative was very quick to tell me...oh I see that you no longer have a warranty but let me look to see if I can find any recalls associated. After a very brief pause he came back online to tell me there are no recalls that would be associated with anything like this happening to the vehicle. This is absolutely ridiculous. I look online and see many other owners experience the same/very similar thing....come on Ford this is

---

[3]    http://www.carcomplaints.com/Ford/Edge/2011/engine/loses_power_wrench_light_on.shtml

BLOOD HURST & O'REARDON, LLP

00111257

not just some freak thing that happened to me. This could very well have been a FAR MORE serious situation had those vehicles not been able to go around me in time to miss hitting my vehicle. Take some responsibility here. I've been a loyal FORD customer for YEARS!!!! And there is nothing they are willing to do other than shrug it off. Well I'm afraid that one day (if not already) your conscientious is going to be full of "we should have or we could have". Lives are at stake here, give me a break![4]

- While driving in the interstate at 45mph, out of nowhere, awd off light then wrench light comes on, vehicle loses all acceleration, engine idles rough, had to turn hazard light on, coast to a stop, put in park, turn off engine, and restart. Did this 3 separate times today alone....very dangerous on the interstate. Has done this in the past several times as well. Stopped at Advance Auto, the hooked up computer and code read, "throttle body" . I have read dozens more complaints about this same problem. Needs recalled before someone is hurt or killed. Very dangerous problem, not to mention expensive.[5]

- My wife drove this 2016 Explorer for about 10 months and put only 5500 miles on it. A couple weeks ago, the vehicle lost power in the middle of a busy intersection. Luckily, she was able to pull to the side of the road without being clobbered by another car. The now infamous "wrench" light came on and the vehicle would only idle at about 2 mph. No response to the gas pedal at all. We had the vehicle towed to the Ford dealer. They told us it was a issue with the software that controls the electronic throttle. The dealer flashed some new control code and called it good ("16B32D Reprogram PCM using IDS release 102.02 or higher"). The vehicle has exhibited some strange quirks, like an erratic idle at stop lights, since getting the new software. Took it back to the dealer, but they insist it can take up to 500 miles before the

---

[4]    *Id.*

[5]    *Id.*

11

Case No.

CLASS ACTION COMPLAINT

computer learns our driving style again and that it will start performing normal sooner or later. My wife won't drive the vehicle anymore. I don't blame her. What if the vehicle loses power again turning left in front of a semi or trying to pass someone on a two lane road. I've been a Ford man my whole life, but I think that's about to change. Thinking hard about trading in the 2016 Explorer on a 2017 Four Runner, despite having to take a $12,000 bath on the Explorer.[6]

- Nothing quite like driving home from Lowes on I-95 going 70MPH and having your new car JOLT and then lose power. The Wrench symbol appeared and said "Check Manual" and then all power was gone. The Airbag light also lit up. We pulled off into some gas station and restarted the vehicle a few times. Eventually, it allowed the power back on and we managed to drive it home. It was towed out of my driveway this morning to the dealership to be checked. They said they know of the issue and will get back to us with an estimated repair date. AND NOW... though making payments on a new car- i YET AGAIN do not have a car!! (This is the second issue with this vehicle)

The entire reason we purchased a new car was so that when traveling with our 18 month old we did not have these types of issues. It is completely unacceptable that you type the problem into google and it is a COMMON PROBLEM WITH THIS CAR? why are you selling these vehicles without fixing this problem? If it had been a busier time of day.. we would have easily been in an accident.... Glad Ford Motor Company is really concerned about the safety of their vehicles. We purchased based on safety ratings... perhaps whoever rates them needs to be on this website to see just how NOT SAFE this car really is. How am I supposed to put my baby in the backseat and know this wont occur again??[7]

---

[6]   http://www.carcomplaints.com/Ford/Explorer/2016/engine/wrench_light _on.shtml

[7]   *Id.*

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

00111257

- Wife was on the highway on the way home at night when the same thing happened to everyone else. Luckily she didn't get rear ended from the sudden slow down on the highway. If this is a recurring problem (which it seems to be) not sure why more isn't being done to make owners more aware and to bring in to fix the problem.[8]

- Just bought a new 2016 Ford Explored Limited last March 2016. Today July 14, 2016 while I was driving with my wife and 2 sons on a 45 mile/hr busy road the engine just turned off and a wrench and air bag light appeared on the screen with a message to see owner's manual. The gas pedal would not work but the AC and radio was still on, it seemed like the car was on "neutral" mode, thankfully it was after rush hour so the traffic was light and I was able to steer the car to the middle center lane. Turned the car on and off maybe 3 times before it went away and we were able to drive the car. As soon as we got home, got online and saw all these posts about the same issue. Will call the dealership tomorrow, I don't trust driving on the highway and this happens. Hopefully they can shed some light as to what needs to be done, but by the recent posts here it seems like this is a major issue that Ford is dealing with. I just don't understand why they still sell these cars if they know there is an issue with the "powertrain".[9]

- I'm from Central California and a new owner of a 2016 Explorer 4wd which I purchased from our Ford dealership here in town back at the end of January. I truly love the suv but I have a problem with it, about three and a half weeks ago it stalled: on my entering the freeway it lost all power and floored would only travel 5 mph max. To make a long story short I pulled off and turned it off and restarted and it ran fine straight to the dealership. After about a day and a half they notified me that the problem was the throttle body, needed replacing. The part was on back order and it would not arrive

---

[8] *Id.*

[9] *Id.*

Case No.

BLOOD HURST & O'REARDON, LLP

00111257

possibly until the end of April. The Explorer only has 5,000 miles. Anyone else encounter that problem?[10]

- While driving on the highway at approx. 60mph my Ford 2016 F150 3.5L V6 lurched and stalled, experiencing a complete loss of power, throttle control and acceleration. This was the 7th throttle malfunction my F150 has experienced in the past 5 months. Each malfunction exactly the same. Since I am now forced to only travel in the far right lanes for safety, I had enough remaining momentum to veer my F150 off of the highway and bring it to a complete stop. With some effort my F150 struggled but was able to restart and traveling a low speeds I made it safely home. Due to the dangerous nature of this incident I have taken my F150 to the dealership twice so far. Ford believes the issue is the electronic throttle body, but they have been unable to fix the problem. Most recently I received my F150 from the dealer only 4 short days ago where they replaced the electronic throttle body, but it had no effect, the problem still exists. The malfunction only occurs during the most dangerous periods of driving, while on the highway/freeway. This malfunction puts the safety of the drivers and their families at risk unnecessarily. I have avoided collisions only by driving and staying in the far right lane at all times. It is only a matter of time before someone else experiences this problem traveling at 65mph on the highway and due to a sudden loss of power and complete acceleration causes a significant traffic accident. I hope this never happens but it is my grave and real concern for my own welfare every time I drive my 2016 F150.[11]

- Was stopped at red light in greensboro nc. Light turned green and I started to drive straight through the intersection when there was a complete loss of throttle response. I had to finish going through the intersection by momentum of the vehicle and gravity since there was no power. Fortunately there was

---

[10]     http://www.explorerforum.com/forums/index.php?threads/2016-explorer-throttle-body-problems.444245/

[11]     http://www.carcomplaints.com/Ford/F-150/2016/engine/engine.shtml

Case No.
CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

00111257

no one else at the intersection or I'm sure I would have been hit. Was told by local Ford dealer, green Ford, problem was a defective "throttle body". 2nd Ford vehicle I have been in, in less than a month, that this has happened (2015 F150-same defect - throttle body). Huge concern for safety of those of us who drive Ford.[12]

33.    Ford warrants, represents and emphasizes "safety" as a key feature of its vehicles. Ford has engaged in a long term advertising campaign in which it promised using advanced technology to produce very safe vehicles, that it prioritizes safety, and that it continually strives to make its vehicles safer. For example, Ford has continually utilized an advertising and branding campaign focused on safety, which is highlighted throughout vehicles brochures, and throughout Ford's websites, social media, television advertisements, nontraditional marketing, and even branding slogans ("Quality, Green, Safe and Smart") that are designed to increase customer awareness of Ford's purported emphasis on safety.

34.    Ford is aware that safety is of primary importance to car purchasers, and is therefore "particularly focused on improving consumers' awareness of the Company's excellent quality, safety, environmental and social performance." Ford has utilized advertising campaigns which highlight safety, one of "Ford's four key brand pillars."

## CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of a proposed Nationwide Class defined as:

> All persons, entities or organizations who own or owned, purchase(d) or lease(d) a Defective Vehicle in any of the fifty States, the District of Columbia, Puerto Rico and all other United States territories and possessions.

---

[12]    *Id.*

BLOOD HURST & O'REARDON, LLP

36.     In the alternative to the Nationwide Class, Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of a proposed California Class defined as:

> All persons, entities or organizations who own or owned, purchase(d) or lease(d) a Defective Vehicle in California.

37.     Excluded from the Classes are: (a) Ford, its officers, directors and employees; its affiliates and affiliates' officers, directors and employees; its distributors and distributors' officers, directors and employees; and Ford Dealers and Ford Dealers' officers and directors; (b) Plaintiff's Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly excluded themselves from the Class.

38.     Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of her claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

39.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The Class consists of more than one million people. Therefore, the Class is so numerous that joinder of all members would be impracticable. The sheer number of Class members makes joinder of all members impracticable.

40.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class members, including:

    a.     whether the Defective Vehicles are defective;

    b.     whether Ford misrepresented the standard, quality, and characteristics of the Defective Vehicles;

00111257

c.     whether Ford's misrepresentations regarding the standard, quality and characteristics of the Defective Vehicles were likely to mislead reasonable consumers;

d.     whether Ford's omission that the ETBs on the Defective Vehicles were defective and prone to SUD was a material fact that a reasonable consumer would be expected to rely on when deciding whether to purchase a vehicle;

e.     whether Plaintiff and the other Class members have been damaged and, if so, the extent of such damages; and

f.     whether Plaintiff and the other Class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

41.    Ford engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

42.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class members because, among other things, Plaintiff and the other Class members were injured through the substantially uniform misconduct described above. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all other Class members, and no defense is available to Ford that is unique to any one Plaintiff.

43.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class members. Additionally, Plaintiff has retained counsel competent and experienced in complex class action

BLOOD HURST & O'REARDON, LLP

00111257

Case No.

**CLASS ACTION COMPLAINT**

litigation. Thus, the Class' interests will be fairly and adequately protected by Plaintiff and her counsel.

44.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Ford, making it impracticable for Class members to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system should not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

45.    Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

46.    Ford is a "person," under Cal. Civ. Code §1761(c).

47.    Plaintiff and Class members are "consumers," as defined by Cal. Civ. Code §1761(d), who purchased or leased one more Defective Vehicles.

48.    Defendant's conduct, as described herein, in misrepresenting the safety of its vehicles, and omitting the fact that it failed to install adequate and reasonable ETBs, and manufactured the Defective Vehicles with a uniform

BLOOD HURST & O'REARDON, LLP

00111257

defect that caused SUD events, violates the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq*. Specifically, Defendant violated the CLRA by omitting material facts and misrepresenting the safety of its Defective Vehicles, and by engaging in the following practices proscribed by Civil Code §1770(a) in transactions that were intended to result in, and did result in, the sale of the product:

    a.    representing that the Defective Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have (Civil Code §1770(a)(5));

    b.    representing that the Defective Vehicles are of a particular standard, quality, or grade if they are of another (Civil Code §1770(a)(7));

    c.    advertising the Defective Vehicles with intent not to sell them as advertised (Civil Code §1770(a)(9)); and

    d.    representing that the Defective Vehicles have been supplied in accordance with previous representations when they have not (Civil Code §1770(a)(16)).

49.    Defendant violated the Act by selling Defective Vehicles that it knew did not have adequate ETBs, possessed uniform defects that caused the Defective Vehicles' to experience dangerous and deadly SUD events, and exposed the public to an unreasonable safety risk. Defendant omitted from Plaintiff and the other Class members the material fact it had a duty to disclose that Defective Vehicles were sold with defective ETBs that caused dangerous SUD events. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

50.    Ford's Customer Satisfaction Programs were false, deceptive and purposely dissuaded customers from bringing their Defective Vehicles in for inspection and/or provided them with a false sense of security by representing that the Defective Vehicles were not subject to dangerous SUD, but merely may

19

Case No.

experience "reduced" engine power and vehicle speed, while maintaining "full function" of steering, braking and lighting systems. The limited Customer Satisfaction Programs instituted by Ford were not adequate and the Defective Vehicles are still defective.

51.     Pursuant to Civil Code §1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to extend repair and replacement remedies to all Class members, and awarding restitution and disgorgement.

52.     Pursuant to §1782 of the Act, Plaintiff notified Defendant in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. A copy of the letter is attached hereto as Exhibit A.

53.     If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act, Plaintiff will amend this complaint to add claims for actual, punitive and statutory damages, as appropriate.

54.     Defendant's conduct is fraudulent, wanton, and malicious.

55.     Pursuant to §1782(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

## COUNT II

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

56.     Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

57.     The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL"), and similar laws in other states, prohibits any

BLOOD HURST & O'REARDON, LLP

"unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising. In the course of conducting business, Defendant committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, and violating Civil Code §§1572, 1573, 1709, 1711, 1770(a)(5), 1770(a)(7), 1770(a)(9), 1770(a)(16), 1793.2 *et seq.*, and Business & Professions Code §§17200, *et seq.*, 17500, *et seq.*, and the common law. Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of the law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

58.    In the course of conducting business, Defendant committed "unfair" business practices by, among other things, making the representations and omissions of material facts regarding the safety on the Defective Vehicles, as alleged. There is no societal benefit from such false and misleading representations and omissions – only harm. While Plaintiff and the other Class members were harmed by this conduct, Defendant was unjustly enriched. As a result, Defendant's conduct is "unfair" as it has offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

59.    Further, as set forth in this Complaint, Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §17200, *et seq*. There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

BLOOD HURST & O'REARDON, LLP

60.    Business & Professions Code §17200, *et seq.*, also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" by among other things, prominently making the representations (which also constitute advertising within the meaning of §17200) and omissions of material facts regarding the safety, characteristics, and production quality of the Defective Vehicles.

61.    Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and likely to deceive the consuming public within the meaning of Business & Professions Code §17200, *et seq.*

62.    Plaintiff has in fact been deceived as a result of her reliance on Defendant's material representations and omissions, which are described above. Plaintiff has suffered injury in fact and lost money as a result of purchasing one of the deceptively advertised Defective Vehicles.

63.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

64.    Plaintiff, on behalf of herself, all others similarly situated, and the general public, seeks restitution from Defendant of all money obtained from Plaintiff and the other members of the Class collected as a result of unfair competition, an injunction prohibiting Defendant from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

65.    Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

66.    Ford is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code §2104.

Case No.

BLOOD HURST & O'REARDON, LLP

00111257

67.     A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code §2314.

68.     Plaintiff and the other Class members purchased the Defective Vehicles that were manufactured and sold by Defendant in consumer transactions. Defendant was and is in the business of selling vehicles and was and is a merchant of the Defective Vehicles.

69.     The Defective Vehicles, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars are used. The Defective Vehicles left Defendant's possession and control equipped with defective ETBs that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to public safety. Plaintiff and the other Class members used their Defective Vehicles in the normal and ordinary manner for which the Defective Vehicles were designed and advertised.

70.     Ford knew before the time of sale to Plaintiff or earlier, that the Defective Vehicles were produced with defective ETBs that lacked adequate protection from dangerous, sudden unintended deceleration events, rendering the Defective Vehicles unfit for their ordinary purpose.

71.     Despite Plaintiff's and the other Class members' normal and ordinary use, maintenance, and upkeep, the ETBs of the Defective Vehicles experienced an unusually high propensity for SUD events as a result of a manufacturing or design defect that existed at the time Defendant transferred the Defective Vehicles from its possession or control. The defect rendered the Defective Vehicles unfit for their ordinary use and incapable of performing the tasks they were designed, advertised, and sold to perform.

72.     As a result, the Defective Vehicles' ETBs are not of fair average quality. Nor would they pass without objection in the automotive industry.

BLOOD HURST & O'REARDON, LLP

00111257

Case No.

**CLASS ACTION COMPLAINT**

Defective ETBs with an unusually high propensity for SUD renders the vehicle unsafe to drive and requires substantial repairs or even replacement of the Vehicle's entire ETB before safe, ordinary use can resume.

73.    All conditions precedent have occurred or been performed.

74.    Defendant has actual notice of its breach of warranty. Through consumer complaints and regulatory agencies' investigations, Defendant learned that the defect, the existence and ubiquity of which it knew much earlier, has been the subject of publicized consumer disputes nationwide. Its implementation of the Customer Satisfaction Programs directed to Defective Vehicles shows actual notice. Prior related lawsuits also establish that Defendant had actual notice of its breach of warranty.

75.    Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendant also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiff's and the other Class members' claims.

76.    As a direct and foreseeable result of the defect in the Defective Vehicles' ETBs, Plaintiff and the other Class members suffered diminution in the value of the Defective Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Defective Vehicles, costs associated with

Case No.

**CLASS ACTION COMPLAINT**

BLOOD HURST & O'REARDON, LLP

00111257

arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

77. Plaintiff and Class members have had sufficient direct dealings with either the Ford or its agents (dealerships) to establish privity of contract between Plaintiff and the Class members. Notwithstanding this, privity is not required in this case because Plaintiff and Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiff's and Class members' Fords are inherently dangerous due to the aforementioned defects and nonconformities.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

78. Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

79. Ford is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code §2104.

80. When marketing, distributing, and selling the Defective Vehicles, Ford expressly warranted that it provided 36 months or 36,000 miles of comprehensive coverage, whichever occurred first, during which time Ford represented it would cover the cost of any repair or replacement necessary due to a defect in materials or workmanship relating to the Defective Vehicles.

81. Defendant also represented and affirmed, contrary to facts, that it delivered safe vehicles. In actuality, the ETBs on the Defective Vehicles experience an unnatural and excessive propensity for SUD. The SUD is a result of a defect in the manufacture or design of the Defective Vehicles.

BLOOD HURST & O'REARDON, LLP

82. Ford knew that the ETBs on the Defective Vehicles were defective at the time of sale. Indeed, Ford was well aware of the ETB problems on the Defective Vehicles. Defendant breached express warranties when Defendant delivered the Defective Vehicles that did not conform to its affirmations of fact and industry standards for ETBs.

83. Ford breached the express warranty to repair the defects in the Defective Vehicles, because it failed to repair or replace the ETBs on the Defective Vehicles to ensure such vehicles function properly and did not exhibit excessive propensity for SUD events.

84. Despite Ford's knowledge of the problem and opportunity to cure (as evidenced by the Customer Satisfaction Programs), Ford failed to notify Plaintiff and the other members of the Class of the defect and to repair or replace, at no charge to the Class, the ETBs and otherwise remedy the Defective Vehicles' excessive and unreasonable propensity for SUD events.

85. All conditions precedent have occurred or been performed.

86. Defendant had actual notice of its breaches of express warranty. Through consumer complaints and regulatory agencies' investigations Defendant learned that the defect, the existence and ubiquity of which it knew much earlier, was the subject of consumer disputes nationwide. Its implementation of the Customer Satisfaction Programs directed at Defective Vehicles shows actual notice. Prior related lawsuits also establish that Defendant had actual notice of its breach of warranty.

87. Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendant also failed to take any

BLOOD HURST & O'REARDON, LLP

Case No.

**CLASS ACTION COMPLAINT**

actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiff's and the other Class members' claims.

88.     Plaintiff and the other Class members were damaged as a result of Ford's breach of express warranty because the ETBs on the Defective Vehicles are defective, compromising the safety and reliability of the vehicles, and requiring repair and even replacement of the Defective Vehicles' ETBs.

89.     As a direct and foreseeable result of Defendant's failure to repair or replace the Defective Vehicles' ETBs, Plaintiff and the other Class members suffered damages, including diminution in the value of the Defective Vehicles, out-of-pocket losses related to the repairing, maintaining, and servicing their Defective Vehicles, costs associated with arranging other forms of transportation, and other incidental and consequential damages recoverable under the law.

## COUNT V

## DECLARATORY RELIEF

### Claim Brought on Behalf of the Declaratory Relief Class

90.     Plaintiff repeats and realleges all paragraphs as if fully set forth herein.

91.     Pursuant to 28 U.S.C. §2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

92.     Defendant marketed, distributed, and sold the Defective Vehicles equipped with ETBs prone to excessive and dangerous sudden unintended deceleration events on account of Defendant's failure to install ETBs on such

BLOOD HURST & O'REARDON, LLP

Case No.
**CLASS ACTION COMPLAINT**

00111257

vehicles free of manufacturing defects and with adequate SUD countermeasures.

93.    Accordingly, Plaintiff seeks entry of the following declarations: (1) the Defective Vehicles lack adequate ETBs and are defective; (2) all persons who purchased or leased the Defective Vehicles are to be provided the best practicable notice of the defect, which cost shall be borne by Defendant; and (3) Defendant must establish an inspection, repair, and replacement program and protocol and notify Class members of such program, pursuant to which Defendant, including its authorized representatives, and at no cost to Class members, will inspect, repair or replace the ETBs on all Defective Vehicles.

## REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter an Order:

a.    certifying the Class under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as requested herein;

b.    appointing Plaintiff as Class Representative and undersigned counsel as Class Counsel;

c.    finding that Ford engaged in the unlawful conduct as alleged herein;

d.    awarding Plaintiff and the other Class members damages;

e.    awarding Plaintiff and the other Class members restitution and disgorgement of monies Defendant acquired through its violations of the law;

f.    awarding Plaintiff and the other Class members declaratory and injunctive relief;

g.    requiring Ford to repair or replace the ETBs on the Defective Vehicles;

h.    awarding Plaintiff and the other Class members pre-judgment and post-judgment interest on all amounts awarded;

Case No.

**CLASS ACTION COMPLAINT**

BLOOD HURST & O'REARDON, LLP

00111257

i.  awarding Plaintiff and the other Class members reasonable attorneys' fees, costs, and expenses; and

j.  granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this Class Action Complaint so triable.

Respectfully Submitted,

Dated: January 26, 2017

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)

By:     *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

NICHOLAS & TOMASEVIC, LLP
CRAIG M. NICHOLAS (178444)
ALEX M. TOMASEVIC (245598)
225 Broadway, 19th Floor
San Diego, CA 92101
Tel: 619/325-0492
619/325-0496 (fax)
cnicholas@nicholaslaw.org
atomasevic@nicholaslaw.org

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
ERICH P. SCHORK
1 North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: 312/621-2000
312/641-5504 (fax)
b.barnow@barnowlaw.com
e.schork@barnowlaw.com

*Attorneys for Plaintiff*

BLOOD HURST & O'REARDON, LLP

00111257

Case No.

CLASS ACTION COMPLAINT